SHAW, Judge.[1]
William Randall Headrick pleaded guilty in DeKalb Circuit Court to two counts of murder; he was sentenced in accordance with § 13A-5-6(a)(4), Ala.Code 1975, to 30 years in prison on each of those counts, with the sentences to run concurrently. Headrick reserved his right to appeal the trial court’s order denying his motion to dismiss the indictment. That motion was based on Headrick’s contention that the State had violated Article IV, subsections (c) and (e) — the “anti-shuttling” and “speedy-trial” provisions — of the Interstate Agreement on Detainers (“IAD”). We affirm.
The IAD, adopted in Alabama through the Uniform Mandatory Disposition of Detainers Act (“UMDDA”), is codified at § 15-9-81, Ala.Code 1975. The IAD is a contract among 48 states, the United States, and the District of Columbia. It is a congressionally sanctioned interstate compact within the Compact Clause, U.S. Const., Art. I, § 10, cl. 3, and thus is a federal law generally subject to federal rather than state construction. “ ‘The [IAD] attempts to remedy the disadvantages and hardships imposed upon prisoners attendant to the use of detainers and to eliminate potential abuses of the detainer system.... The [IAD] provides the prisoner with a method of clearing detainers lodged against him. It further provides cooperative proceedings for temporary transfer of prisoners for purposes of trial on outstanding charges among the participating jurisdictions to aid with disposition.’ ” Ex parte Bozeman, 781 So.2d 165, 167 n. 2 (Ala.2000), aff'd, 533 U.S. 146, 121 S.Ct. 2079, 150 L.Ed.2d 188 (2001), quoting Gillard v. State, 486 So.2d 1323, 1325 (Ala.Crim.App.1986). The primary purpose of the IAD is to address concerns that untried charges pending in other jurisdictions and difficulties in obtaining a speedy trial create uncertainties that interfere with and disrupt prisoner rehabilitation and treatment programs. For a full discussion of the history and background of the IAD, see United States v. Mauro, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978). See also Carchman v. Nash, 473 U.S. 716, 105 S.Ct. 3401, 87 L.Ed.2d 516 (1985); Cuyler v. Adams, 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981); and Donald M. Zupanec, Annot., Validity, Construction, and Application of Interstate Agreement on Detainers, 98 A.L.R.3d 160 (1980).
The pertinent portions of the IAD provide:
*520 “Article I
“The party states find that charges outstanding against a prisoner, detainers based on untried indictments, informa-tions or complaints and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. Accordingly, it is the policy of the party states and the purpose of this agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints. The party states also find that proceedings with reference to such charges and detainers, when emanating from another jurisdiction, cannot properly be had in the absence of cooperative procedures. It is the further purpose of this agreement to provide such cooperative procedures.
“Article II
“As used in this agreement:.
“(a) ‘State’ shall mean a state of the United States; the United States of America; a territory or possession of the United States; the District of Columbia; the Commonwealth of Puerto Rico.
“(b) ‘Sending state’ shall mean a state in which a prisoner is incarcerated at the time that he initiates a request for final disposition pursuant to article III hereof or at the time that a request for custody or availability is initiated pursuant to article IV hereof.
“(c) ‘Receiving state’ shall mean the state in which trial is to be had on an indictment, information or complaint pursuant to article III or article IV hereof.”
“Article IV
“(a) The appropriate officer of the jurisdiction in which an untried indictment, information or complaint is pending shall be entitled to have a prisoner against whom he has lodged a detainer and who is serving a term of imprisonment in any party state made available in accordance with article V(a) hereof upon presentation of a written request for temporary custody or availability to the appropriate authorities of the state in which the prisoner is incarcerated; provided, that the court having jurisdiction of such indictment, information or complaint shall have duly approved, recorded and transmitted the request; and provided further, that there shall be a period of 30 days after receipt by the appropriate authorities before the request be honored, within which period the governor of the sending state may disapprove the request for temporary custody or availability, either upon his own motion or upon motion of the prisoner.
[[Image here]]
“(c) In respect of any proceeding made possible by this article, trial shall be commenced within 120 days of the arrival of the prisoner in the receiving state, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.
[[Image here]]
“(e) If trial is not had on any indictment, information or complaint contemplated hereby prior to the prisoner’s being returned to the original place of imprisonment pursuant to article V(e) hereof, such indictment, information or complaint shall not be of any further force or effect, and the court shall enter *521 an order dismissing the same with prejudice.”
The facts pertinent to the present case are as follows: Headrick was indicted on September 17, 1998, by the DeKalb County grand jury on state charges stemming from the killing of Dora Dalton and Carolyn Headrick. At the time of the indictment, Headrick was being held in the Eto-wah County jail pending disposition of federal firearms charges in the United States District Court for the Northern District of Alabama. On September 21, 1998, the DeKalb County Sheriffs Department sent a fax, along with a follow-up letter, to the attention of the “US Marshal Service,” requesting that Headrick be held for future state proceedings. Headrick pleaded guilty to the federal charges and the federal district court pronounced his sentence on January 7, 1999. On January 13, 1999, the federal district court signed its judgment of conviction and sentence; that judgment was entered by the clerk of that court on January 15, 1999. By its judgment of January 13, 1999, the federal district court remanded Headrick to the temporary custody of the United States Marshal for the Northern District of Alabama, whereupon he was to be transferred to the custody of the United States Bureau of Prisons. While awaiting transfer to a federal penitentiary, Headrick was temporarily returned to the Etowah County jail. On January 14, 1999, Headrick was transported to the DeKalb Circuit Court for arraignment on the state murder charges. He was transported back to the Etowah County jail that same day. Sometime near the end of January 1999, Headrick was transferred from the Eto-wah County jail to the federal penitentiary in Leavenworth, Kansas. On February 3, 1999, Headrick filed a motion in DeKalb Circuit Court seeking a court-ordered mental-competency examination. The trial court granted that motion on February 11, 1999, continuing the case pending the filing of a competency report. On June 16, 1999, the State mailed a formal “Request for Temporary Custody” to prison officials at the Leavenworth facility seeking temporary custody of Headrick under the IAD. That request was signed by the DeKalb County district attorney and Randall L. Cole, presiding judge of the DeKalb Circuit Court, as required by Article IV(a) of the IAD. Headrick was transferred from the federal penitentiary to DeKalb County on October 1, 1999. On January 4, 2000, Headrick withdrew his motion seeking a mental-competency examination. On January 5, 2000, the State filed a motion to continue the case beyond the 120-day period set out in Article IV(c) of the IAD. On January 11, 2000, the State filed an amended motion to continue the case; on that same day the trial court set a trial date of May 15, 2000. Headrick’s federal sentence expired on February 11, 2000. On that same day, Headrick filed a motion to dismiss the indictment with prejudice, alleging a violation of Article IV(c) of the IAD (the “speedy-trial” provision). On April 27, 2000, he filed a motion to dismiss the indictment with prejudice, alleging a violation of Article IV(e) of the IAD (the “anti-shuttling” provision).
The trial court entered separate orders — on May 4, 2000, and May 5, 2000, respectively — addressing the merits of Headrick’s arguments and denying his motions. The trial court ruled that Head-rick’s transfer to Etowah County following his arraignment did not require the dismissal of the indictment under Article IV(e) of the IAD because, it said, the September 21, 1998, hold that the DeKalb County sheriff had placed on Headrick did not constitute a detainer under the IAD. The trial court stated the following in its May 4 order:
*522 “In order for a detainer to be placed in accordance with the Uniform Mandatory Disposition of Detainers Act, the request for the detainer must be ‘duly approved, recorded and transmitted’ by ‘the court having jurisdiction of such indictment, information or complaint.’ Title 15-9-81, Article IV(a), Code of Alabama (1975). In this ease there was no such request by this court. On the contrary, the ‘detainer’ in question was merely a letter from the DeKalb County Sheriff to the federal authorities notifying them that the Defendant had been indicted in state court. The record in this case does not establish whether the District Attorney authorized or even knew of this communication by the Sheriff to the federal authorities.
“Because there had been no detainer filed in accordance with the statutory requirements of the Uniform Mandatory Disposition of Detainers Act [Title 15 — 9— 80, Code of Alabama (1975)] the Bozeman case [Ex parte Bozeman, 781 So.2d 165 (Ala.2000)] does not control.”
(R. 215-16.)
The trial court held in its May 5 order that dismissal of the indictment was not necessary, even though a trial was not scheduled to commence within 120 days of Headrick’s arrival in Alabama from the federal penitentiary in Kansas, as required by Article IV(c) of the IAD. The trial court found “that the State has shown good cause in open court with the defendant and his attorney present, why the commencement of the trial of this case should be scheduled ... beyond the 120-day deadline argued by the defendant.” (R. 226.) Headrick pleaded guilty to the two counts of murder on May 11, 2000.
Relying primarily on Ex parte Bozeman, supra, Headrick argues that the trial court erred in ruling that the September 21, 1998, hold placed on him by the DeKalb County sheriff did not constitute a detainer under the IAD. In addition to arguing that the sheriffs actions on September 21, 1998, constituted a detainer, Headrick takes the alternative position that, by returning him to federal custody in Etowah County following his arraignment on the murder charges in DeKalb County, the State violated the plain language of the IAD, as interpreted in Bozeman, because, he says, he had already been sentenced on the federal charges when he was transferred to DeKalb County on January 14, 1999. The State contends that the September 21, 1998, hold placed by the DeKalb County sheriff did not constitute a detainer under the IAD; it argues that Headrick had not been convicted or sentenced in federal court as of September 21, 1998. Therefore, the State takes the position that Headrick was merely a pretrial detainee in Etowah County when the DeKalb County sheriff requested that he be held. Thus, according to the State, Bozeman does not control because under the plain language of the IAD there was no violation of Article IV(e).
In Bozeman, the Alabama Supreme Court, following the rationale of United States v. Sorrell, 413 F.Supp. 138 (E.D.Pa.1976), aff'd, 562 F.2d 227 (3d Cir.1977), cert. denied, 436 U.S. 949, 98 S.Ct. 2858, 56 L.Ed.2d 793 (1978), refused to construe the IAD in accordance with existing federal cases that hold that technical violations of the IAD do not warrant dismissal of an indictment. The Court elected, instead, to apply the IAD strictly as written, in accordance with its plain language.[2] Bozeman stands for the proposition that even a tech- *523 nieal violation of the IAD on the part of the State will require the dismissal of an indictment on state charges. However, the Bozeman opinion presupposed the existence of a detainer.
After carefully reviewing the record and the briefs, we agree with the trial court’s conclusion that there was no violation of the “anti-shuttling” provision of the IAD. However, we disagree with the trial court’s rationale. The record indicates that at the time Headrick was transferred from Eto-wah County to DeKalb County for arraignment on January 14, 1999, there was no detainer pending against Headrick that would require application of the dismissal sanctions in Article IV(e). Although, as the trial court stated, the September 21, 1998, hold placed on Headrick was not “approved, recorded and transmitted” by the DeKalb Circuit Court, the validity of a detainer under Article IV(a) of the IAD does not depend upon such action having been taken by the circuit court. Article IV(a) requires only that such official action be taken with respect to the State’s request for temporary custody. Article IV(a) makes a distinction between a de-tainer and a request for temporary custody. The IAD does not define “detainer.” However, the United States Supreme Court, in United States v. Mauro, 436 U.S. at 359, 98 S.Ct. 1834, stated:
“The IAD itself contains no definition of the word ‘detainer.’ The House and Senate Reports, however, explain that ‘[a] detainer is a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction.’ H.R.Rep. No. 91-1018, p. 2 (1970); S.Rep. No. 91-1356, p. 2 (1970); U.S.Code Cong. & Admin. News 1970, p. 4865.”
In Carchman, 473 U.S. at 719, 105 S.Ct. 3401, the United States Supreme Court, citing Cuyler, Mauro, and Moody v. Daggett, 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976), stated:
“A detainer is a request filed by a criminal justice agency with the institution in which a prisoner is incarcerated, asking the institution either to hold the prisoner for the agency or to notify the agency when release of the prisoner is imminent.”
See also Reed v. Farley, 512 U.S. 339, 342 n. 1, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994). The Carchman Court went on to state that the IAD is based on a legislative finding that “charges outstanding against a prisoner, detainers based on untried indictments, informations or complaints, and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation.” 473 U.S. at 719-20, 105 S.Ct. 3401 (emphasis added). And, in Alabama v. Bozeman, 533 U.S. 146, 121 S.Ct. 2079, 150 L.Ed.2d 188 (2001), the United States Supreme Court stated that the IAD “creates uniform procedures for lodging and executing a detainer, i.e., a legal order that requires a State [defined by the Court as including 48 states, the federal government, and the District of Columbia] in which an individual is currently imprisoned to hold that individual when he has finished serving his sentence so that he may be tried by a different State for a different crime.” 533 U.S. at 2082, 121 S.Ct. at 2082. This Court is bound by these statements from the United States Supreme Court with respect to the meaning of the word “detainer” in the IAD. See Bozeman, 781 So.2d at 168.
On September 21, 1998, Headrick was a pretrial detainee in the Etowah County jail, awaiting trial on federal firearms charges. He was not a prisoner serving a sentence. Therefore, the hold *524 that was placed on Headrick on September 21, 1998, was not a detainer under the IAD. See, e.g., Bruce v. State, 998 S.W.2d 91 (Mo.Ct.App.1999); State v. Herrick, 686 A.2d 602 (Me.1996). See also State v. Watson, 657 A.2d 776 (Me.1995) (holding that the IAD applies only to prisoners who are actually serving their sentences). Furthermore, we cannot agree with Headrick that the hold became a detainer upon his conviction and sentence in federal court. The hold was filed with the United States Marshal. After sentencing Headrick on the federal charges, the federal district court remanded him into the temporary custody of the United States Marshal, pending his commitment into the custody of the United States Bureau of Prisons. The United States Marshal is not an “institution” in which Headrick was incarcerated or serving a sentence. Mauro, 436 U.S. at 359, 98 S.Ct. 1834; Carchman, 473 U.S. at 719, 105 S.Ct. 3401. Furthermore, we cannot conclude that a person incarcerated in a local jail or holding facility pending imminent transfer to a federal prison is in an “institution” within the meaning of the Mauro and Carchman definition of a detainer and Article IV(a) of the IAD.
Headrick had been sentenced on the federal charges by the time he was transported to DeKalb Circuit Court for arraignment on January 14,1999, and he had begun to serve his sentence while awaiting transfer to the Leavenworth facility; however, the Supreme Court in Mauro and Carchman clearly stated that, by definition, a detainer is a notification that is filed with an institution in “another jurisdiction.” This is entirely consistent with the interstate nature of the IAD and with the plain language of Article IV(a), which specifically requires the detainer to have been lodged with a person “who is serving a term of imprisonment in any party state.” The word “state” is defined as including “the United States of America.” See Article 11(a) of the IAD; see also Turner v. State, 584 So.2d 925 (Ala.Crim.App.1991); United States v. Groomes, 520 F.2d 830, 838 (3rd Cir.1975). Headrick was never in an “institution” within the meaning of the IAD until he was transported to Leavenworth. Our conclusion in this respect is consistent with the purpose of the IAD — to eliminate uncertainties that interfere with and disrupt prisoner rehabilitation and treatment programs — programs that are generally not afforded in local jails. See Article I of the IAD; see also State v. Breen, 126 Idaho 305, 882 P.2d 472 (Idaho Ct.App.1994), citing United States v. Taylor, 861 F.2d 316, 320 (1st Cir.1988); Crooker v. United States, 814 F.2d 75, 77-78 (1st Cir.1987); United States v: Wilson, 719 F.2d 1491, 1494-95 (10th Cir.1983); United States v. Roberts, 548 F.2d 665, 670 (6th Cir.1977); Lublin v. Johnson, 628 F.Supp. 1496, 1499-1500 (E.D.N.Y.1986).
Based on the plain language of the IAD, we hold that a detainer was never lodged against Headrick while he was temporarily housed in the Etowah County jail; therefore, the State did not violate Article IV(e) when it returned him to Etowah County following his arraignment in DeKalb Circuit Court.
With respect to the trial court’s May 5 order holding that the State had shown good cause for continuing the trial beyond the 120-day period specified in Article IV(c), we note that Headrick did not object to the trial court’s order granting the State’s motion for a continuance. The failure of a defendant to object to a motion for a continuance before the 120-day period expires precludes appellate review of the issue. See Wilson v. State, 727 So.2d 869, 870 (Ala.Crim.App.1998); Glover v. State, 599 So.2d 79, 81 (Ala.Crim.App.1992). In any event, even if the issue had been preserved, we would agree with *525 the trial court’s conclusion that the 120-day period was tolled until Headrick withdrew his motion for a mental-competency examination and that the State showed good cause for continuing the trial beyond the 120-day period. The trial court explained in its May 5 order as follows:
“On February 3, 1999, the Defendant filed a MOTION FOR COURT ORDERED MENTAL EXAMINATION OF DEFENDANT (hereinafter Motion for Mental Evaluation), and for a stay of the subject proceedings. On February 11, 1999, an Order for a mental evaluation was entered by this Court, and the case was continued at the Defendant’s request to await the outcome of the said mental evaluation.
“On June 16, 1999, the State of Alabama filed a detainer pursuant to the Uniform Mandatory Disposition of De-tainers Act (hereinafter Act), Title 15 — 9— 80 et seq., Code of Alabama (1975), which resulted in the delivery of the Defendant from the federal authorities to the state authorities on October 1, 1999.
“Under the Act, the trial of a Defendant delivered to the custody of the State of Alabama at the state’s request should commence within 120 days of the arrival of the prisoner in the receiving state unless the time is extended beyond 120 days in accordance with the Act. Accordingly, the Defendant apparently argues that the deadline for commencing the trial was January 19, 2000.
“In the Defendant’s MOTION FOR MENTAL EVALUATION the Defendant ‘move[d] that the prosecution of the case be stayed pending the outcome of such [mental] evaluations,’ and at the time the Defendant arrived in the State of Alabama, the Defendant’s MOTION FOR MENTAL EVALUATION was still pending. It remained pending until withdrawn on January 4, 2000.
“At the time the Defendant arrived in the State of Alabama, the Defendant’s attorney knew or should have known from the Court’s published annual calendar that the next criminal jury week in DeKalb County began on October 4, 1999, before Hon. Randall L. Cole, and that no week of criminal jury trials was thereafter calendared to begin until February 14, 2000, before the undersigned judge.
“Because the mental evaluation had not been completed, and the case had been continued at the Defendant’s request, and because the Defendant had only been in state custody two days prior to the earliest scheduled trial week, the case was not added to the October 4, 1999, docket. Likewise, the case was not included on the February 14, 2000, docket pending the outcome of the Defendant’s requested mental evaluation.
“Nevertheless, apparently recognizing that January 19, 2000, was the 120-day deadline, in an exercise of caution, on January 5, 2000, the State of Aabama filed a Motion to continue the case beyond the 120-day deadline. On January 11, 2000, the State filed a supplemental Motion to continue. The Defendant did not file an objection to the Motions to continue until the filing of the MOTION TO DISMISS on February 11, 2000.
“The Defendant’s MOTION FOR MENTAL EVALUATION was withdrawn by the Defendant on January 4, 2000. The Defendant’s attorney who withdrew the said Motion had been an attorney of record since July 14, 1999, but until January 4, 2000, neither this court nor the State had any reason to believe that the Defendant did not wish to pursue the MOTION FOR MENTAL *526 EVALUATION and his corresponding plea of not guilty by reason of mental disease or defect. It was not until January 4, 2000, ... the eve of the January 19 deadline now asserted by the Defendant, [that] the Defendant’s attorney advised the Court that he ‘has not had any difficulty communicating with the Defendant.’
“During the period that the MOTION FOR MENTAL EVALUATION was pending, the 120-day deadline was tolled. Accordingly, the 120-day deadline for commencing the trial did not begin to run until the MOTION FOR MENTAL EVALUATION was withdrawn on January 4, 2000. The deadline established by counting from that date is May 2, 2000. The trial of this case is scheduled to commence on May 15, 2000.
“When the State filed the MOTION TO CONTINUE which resulted in the Order of continuance on January 11, 2000, the Defendant’s attorney and the District Attorney conferred to arrive at a convenient trial setting. As a result, the case was set to begin on May 15, 2000, to give the attorneys reasonable time to present and resolve motions and for other pretrial procedures.
“The first trial week following the Defendant’s withdrawal of his MOTION FOR MENTAL EVALUATION was February 14, 2000. The Defendant’s attorney knew that another capital murder case was scheduled for that week, and that the District Attorney could not reasonably prepare for trial of the instant case as well as the other cases between January 4, 2000, and February 14, 2000. Nevertheless, on February 11, 2000, the Defendant filed a MOTION TO DISMISS the instant case because it was not scheduled to commence on February 14, 2000.
“In setting this case for trial on May 15, 2000, this court was mindful of the wishes of both the Defendant’s attorney and the District Attorney to have the court set a date that accommodated the attorneys’ respective schedules. No only did the District Attorney have another capital murder trial scheduled to begin on February 14, 2000, a capital murder case and a non-capital murder case were also set for trial on March 13, 2000, and another murder case was set for trial on April 3, 2000. All of these cases involved Defendants who had been in confinement much longer than the Defendant in the instant case.
“Title 15-9-81, Article IV(c) provides that a Defendant who has been made available for trial pursuant to the Uniform Mandatory Disposition of Detain-ers Act must be put to trial within 120 days of his arrival in the receiving state unless ‘for good cause shown in open court, the prisoner or his counsel being present, the Court ... [grants a] necessary or reasonable continuance.’
“This court scheduled a hearing on this matter as raised in the subject MOTION TO DISMISS INDICTMENT WITH PREJUDICE on April 7, 2000, at which time the Defendant’s attorney was present with the Defendant. To accommodate the attorneys, the hearing was rescheduled for April 27, 2000, at which time the Defendant and his attorney were again present.
“The 120-day period did not begin to run until the MOTION FOR MENTAL EVALUATION was withdrawn on January 4, 2000. The trial date of May 15 was implicitly agreed to by the attorneys of record.”
(R. 221-26.) We find no error in the trial court’s order. See Saffold v. State, 521 So.2d 1368 (Ala.Crim.App.1987).
*527 For the foregomg reasons, the judgment of the trial court is affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur.

. This case was originally assigned to another judge on this Court. It was reassigned to Judge Shaw on January 16, 2001.

. Recently, in Alabama v. Bozeman, 533 U.S. 146, 121 S.Ct. 2079, 150 L.Ed.2d 188 (2001), the United States Supreme Court affirmed that plain language interpretation.