[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 480 
The Alabama Board of Pardons and Paroles ("the Board") appeals an order of the Montgomery Circuit Court granting Dennis E. Williams's petition for a writ of certiorari and reinstating his parole.[1] We reverse and remand. *Page 481 
The record reflects the following material facts. On July 15, 1981, Williams was convicted in the Colbert Circuit Court of murder and was sentenced to 30 years in prison. He was paroled on March 13, 1995, to Ohio, pursuant to an interstate compact between Alabama and Ohio,[2] where he was to remain under the supervision of the Ohio Adult Parole Authority ("the OAPA"). On or about July 4, 1995, Williams was arrested in Ohio on a drug charge. Following a preliminary probable-cause hearing held on August 9, 1995, the OAPA found probable cause to believe that Williams had violated the conditions of his Alabama parole.[3] The OAPA notified the Board of the alleged violation and, by correspondence dated August 25, 1995, requested that the Board issue a warrant for Williams's arrest and return to Alabama for a hearing on the alleged parole violation. On September 7, 1995, the Board authorized the issuance of the warrant and directed the Alabama Department of Corrections ("the DOC") to immediately issue the warrant pursuant to § 15-22-31(a), Ala. Code 1975.[4] Shortly thereafter, on September 11, 1995, the Board declared Williams delinquent.
On September 15, 1995, Williams pleaded guilty in Ohio to the drug charge (attempted trafficking in heroin) and was sentenced to six months in an Ohio correctional facility. On October 6, 1995, the Board received notice from the OAPA that Williams had pleaded guilty not only to the drug charge but also to a charge of receiving stolen property.[5] For reasons not apparent from the record, the DOC failed to issue the parole violator's warrant the Board had authorized. After serving his six-month sentence in Ohio, Williams was released from custody; he claims he notified Alabama authorities of his release and continued to report to the OAPA.[6] Almost *Page 482 
five years later, Williams was arrested in Washington, D.C., on new federal felony charges (conspiracy and theft).
On August 11, 2000, the DOC issued a parole violator's warrant ordering that Williams be returned to Alabama to face the parole-violation charge that arose out of the September 15, 1995, Ohio conviction. Shortly thereafter, that warrant was executed and Williams was returned to Alabama in September 2000, where he remained in the custody of the DOC for approximately four to six months. In February 2001, Williams was transferred by federal authorities from Alabama to Washington, D.C., to stand trial on the charges pending there. Williams was eventually convicted of those charges and received concurrent five-year sentences of imprisonment to be followed by three years on probation. Williams was returned to Alabama in December 2001. Approximately five or six months later, on June 6, 2002, Williams was notified that a parole hearing would be held at Kilby Correctional Facility on June 25, 2002, to consider whether his parole should be revoked. However, before that hearing could be held, Williams was transferred by the DOC to Staton Correctional Facility. On July 25, 2002, Williams was notified that a parole hearing had been rescheduled for August 14, 2002. That hearing was then continued at Williams's request to accommodate his lawyer.
On July 29, 2002, Williams filed a petition for a writ of certiorari in the Montgomery Circuit Court seeking to prevent the Board from proceeding with the revocation process. Specifically, Williams alleged 1) that the Board had lost jurisdiction over him pursuant to the interstate compact, by which Ohio agreed to supervise him while he was on parole from Alabama; 2) that the Board was barred by the doctrine of res judicata from proceeding with the revocation process because, he claimed, Ohio had already considered the matter and had not revoked his parole; 3) that the Board was barred by the doctrine of collateral estoppel from proceeding with the revocation process because, he claimed, Ohio had already considered the matter; and 4) that the DOC had failed to timely issue a warrant charging him with violating parole and that the delay caused by that failure on the DOC's part and by the Board's failure to follow up on its authorization to ensure the issuance of the warrant had divested the Board of jurisdiction over him.
The Board responded to the petition, arguing that Williams's claims were premature because the Board had not yet revoked his parole and, in the alternative, that his claims were without merit. On January 22, 2003, Williams was notified that a parole hearing would be held on January 28, 2003. At the January hearing Williams pleaded guilty to violating the conditions of his parole by committing another offense in Ohio. The Board revoked Williams's parole on March 3, 2003.
A final hearing was held on Williams's certiorari petition on November 12, 2003.[7] At the hearing, Williams testified and, through counsel, introduced various exhibits and argued again that the DOC's delay *Page 483 
in issuing and executing the parole violator's warrant had divested the Board of jurisdiction to revoke his parole. In addition, Williams argued that the Board had failed to hold a parole hearing within a reasonable time after he was taken into custody and returned to Alabama and that he had been so prejudiced by the delay that the Board should be required to reinstate his parole. On November 19, 2004, the circuit court entered an order reinstating Williams's parole on the ground that Williams's due-process rights (presumably both substantive and procedural) had been violated as a result of the Board's holding the revocation hearing "seven years and four months after declaring him delinquent." (C. 133.)
The Board argues on appeal that the circuit court erred in reinstating Williams's parole. The Board contends that, in assessing the reasonableness of any pre-custody delay in executing the warrant for the parole violation, the focus should be on Williams's actions after he finished serving his six-month sentence in Ohio on the drug conviction. The Board maintains that Williams knew that he was still on parole following his release from custody in Ohio and that he was under a legal obligation to report to Alabama authorities because, the Board asserts, the OAPA had advised him it had no further interest in supervising him. According to the Board, Williams absconded supervision for the approximate four-and-one-half-year period following his release from custody in Ohio and, under those circumstances, he should not be allowed to benefit from the DOC's delayed issuance and execution of the warrant. In the alternative, the Board contends, among other things, that it proceeded with reasonable diligence to authorize the DOC to issue a parole violator's warrant after Williams committed an offense in Ohio. The Board argues that, under the circumstances presented in this case, it did not lose jurisdiction over Williams by entrusting the DOC to perform a ministerial duty.
In addition, the Board argues that in assessing the reasonableness of any post-custody delay in holding a parole hearing, a court should use a test similar to the four-pronged test applied in cases involving the alleged denial of the right to a speedy trial. The record indicates that the total time elapsed between Williams's return to Alabama in September 2000 and the parole hearing on January 28, 2003, was approximately 28 to 29 months. Citing Barker v. Wingo, 407 U.S. 514,92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Board argues 1) that for approximately 9 to 11 months of that period Williams was in Washington, D.C., in connection with federal charges he was facing there; 2) that the DOC's transfer of Williams from Kilby Correctional Facility to Staton Correctional Facility and the request by Williams's lawyer for a continuance of the August 14, 2002, parole hearing resulted in delays that were beyond the Board's control and that should not be counted against it; 3) that the actual delay that can be attributed to the Board was approximately 10 to 13 months (representing the period between September 2000, when Williams was returned to Alabama pursuant to the parole violator's warrant, and February 2001, when Williams was transferred to Washington, D.C., and the period between December 2001, when Williams was returned to Alabama from Washington, D.C., and June 25, 2002, when the first parole hearing was scheduled); 4) that Williams did not raise the issue of the delay until he filed his certiorari petition on July 29, 2002; and 5) that the record does not indicate that Williams suffered any prejudice as a result of the delay because he had already been convicted in Ohio on the charge that formed the basis for the revocation, *Page 484 
leaving only the issue of mitigation for the Board's consideration.
Williams argues that the Board was negligent in failing to follow up on its request for the DOC to issue a warrant for a parole violation and that that failure resulted in an unreasonable delay in the issuance and execution of the warrant and constituted a waiver of jurisdiction by the Board. Williams maintains that the Board's subsequent revocation of his parole, which it was, he argues, without jurisdiction to do, violated his right to substantive due process under the Fourteenth Amendment to the United States Constitution. Williams also appears to argue that the Board failed to hold a parole hearing within a reasonable time after he was returned to Alabama and that the delay that resulted violated his right to procedural due process under the Fourteenth Amendment.[8]
In Ellard v. State, 474 So.2d 743 (Ala.Crim.App. 1984), aff'd, 474 So.2d 758 (Ala. 1985), this Court set out the standard of review applicable to a certiorari petition seeking review of a decision of the Board:
 "On petition for writ of certiorari the circuit court is, as is the appellate court, limited in its review of quasi-judicial acts of administrative officers and boards. The limited function of that review is to determine whether the act in question was supported by any substantial evidence, or whether findings and conclusions are contrary to uncontradicted evidence, or whether there was an improper application of the findings viewed in a legal sense. Sanders v. Broadwater, 402 So.2d 1035 (Ala.Civ.App. 1981). Judicial review of administrative acts and decisions is limited in scope, and ordinarily the courts will only pass on the question of whether the administrative agency has acted within its constitutional or statutory powers, whether its order or determination is supported by substantial evidence, and whether its action is reasonable and not arbitrary. Little Caesar's, Inc. v. Alabama Alcoholic Beverage Control Bd., 386 So.2d 224
(Ala.Civ.App. 1979)."
474 So.2d at 750.
The dispositive issues before this Court, as we understand them, are 1) whether the pre-custody delay in the issuance and execution by the DOC of a warrant charging Williams with a parole violation divested the Board of jurisdiction over Williams so that the Board's subsequent revocation of his parole exceeded its statutory authority and thereby violated his substantive due-process rights, and 2) whether the post-custody delay in holding the parole hearing was unreasonable and constituted a denial of Williams's right to procedural due process.[9] *Page 485 
 Pre-Custody Delay
In Hawkins v. Freeman, 195 F.3d 732 (4th Cir. 1999), the United States Court of Appeals for the Fourth Circuit discussed the waiver-of-jurisdiction theory Williams relies on:
 "Commonly traced in origin to the Fifth Circuit's decision in Shields v. Beto, 370 F.2d 1003 (5th Cir. 1967), this theory employs the fictive notion that by prolonged failure to incarcerate a convict who `owes it time' (either original or `interrupted') a government may `waive its jurisdiction' to do so, thereby making any later incarceration one effected without jurisdiction and so a violation of due process. As originally formulated and applied in Shields,[6] the theory seemed to require nothing more than prolonged inaction by government to prove a due process violation (presumably `substantive'). Undoubtedly sensing that if so understood the rule could not pass muster as one of constitutional stature, the Fifth Circuit took the occasion some six years later in Piper v. Estelle, 485 F.2d 245 (5th Cir. 1973) (per curiam), to cabin in that aspect of the rule concerned with the required level of government culpability. Emphasizing that `lack of eager pursuit' or `lack of interest' is not enough, Piper held that `the . . . action must be so affirmatively wrong or [the] inaction so grossly negligent that it would be unequivocally inconsistent with fundamental principles of liberty and justice to require [that the "time owed"] be served. . . .' Id. at 246 (quotation omitted). It is Piper's
formulation that has since been used by courts applying this `waiver of jurisdiction' theory to constitutional due process claims. While that formulation surely moved in the direction of the conscience-shocking standard mandated in [Sacramento v.] Lewis, [523 U.S. 833, 118 S.Ct. 1708 (1998),] it as surely fails to embody the full stringency of that standard's requirement that to be `conscience-shocking,' `arbitrary in the constitutional sense,' an executive act must be not only `wrong,' but egregiously so by reason of its abusive or oppressive purpose and its lack of justification by any government interest. See Lewis, 118 S.Ct. at 1716-20. Significantly, even when applying *Page 486 
the less-exacting Shields/Piper `waiver' standard of executive culpability, the great majority of decisions have found it not met on the facts of the particular case.[7]
 "[6] Finding common law antecedents of this theory (and a related one of `implied pardon') in a few federal and state cases, Shields adopted it as a constitutional rule in a habeas case in which a state had incarcerated a prisoner 28 years after it had released him in mid-sentence to another state and 18 years after the latter state had paroled him in the absence of any detainer filing by the incarcerating state. See Shields, 370 F.2d at 1003-04.
 "[7] See Camper v. Norris, 36 F.3d 782 (8th Cir. 1994); [United States v.] Martinez, 837 F.2d 861
[(9th Cir. 1988)]; Mobley v. Dugger, 823 F.2d 1495
(11th Cir. 1987); Green v. Christiansen, 732 F.2d 1397 (9th Cir. 1984); Mathes v. Pierpont, 725 F.2d 77 (8th Cir. 1984); Piper [v. Estelle], 485 F.2d 245 [(5th Cir. 1973)]; Patterson v. O'Dea, [No. 95-6561] (6th Cir. 1996) (unpublished); Hallums v. Hambrick, [No. 63-6632] (6th Cir. 1994) (unpublished); Mistretta v. Whalen, [No. 92-1311] (7th Cir. 1993) (unpublished); Christian v. Smith,
[No. 90-6482] (6th Cir. 1991) (unpublished); Sterling v. Maggio, 505 F.Supp. 1111 (M.D.La. 1981); Farley [v. Nelson], 469 F.Supp. 796
[(D.C.Conn. 1979)]; Bailey v. Ciccone, 420 F.Supp. 344 (W.D.Mo. 1976); Esquivel v. Estelle, 426 F.Supp. 619 (W.D.Tex. 1976), aff'd, 547 F.2d 309
(5th Cir. 1977); Clifton v. Beto, 298 F.Supp. 1384
(S.D.Tex. 1968), aff'd on other grounds, 411 F.2d 1226 (5th Cir. 1969); United States v. Vann, 207 F.Supp. 108 (E.D.N.Y. 1962); United States v. Brandt, [No. 87-C-5113] (N.D.Ill. Aug. 26, 1987) (unpublished). But see Shields [v. Beto], 370 F.2d 1003 [(5th Cir. 1967)] (finding for prisoner on the facts); Johnson [v. Williford], 682 F.2d 868
[(9th Cir. 1982)] (same) (alternative ground); Lanier v. Williams, 361 F.Supp. 944 (E.D.N.C. 1973) (same); Shelton [v. Ciccone], 578 F.2d 1241 [(8th Cir. 1978)] (granting prisoner evidentiary hearing on issue of waiver); see also United States v. Merritt, 478 F.Supp. 804 (D.D.C. 1979) (applying Piper standard to require release of prisoner where time spent on erroneous release would, if credited, have caused sentence to expire)."
195 F.3d at 743-44.
Recently, in United States v. Barfield, 396 F.3d 1144 (11th Cir. 2005), the United States Court of Appeals for the Eleventh Circuit explained the theory as follows:
 "This Court has held a delay in the execution of a sentence can, under certain circumstances, amount to a due process violation under the waiver of jurisdiction theory. See Piper v. Estelle, 485 F.2d 245 (5th Cir. 1973); Shields v. Beto, 370 F.2d 1003
(5th Cir. 1967); see also Mobley v. Dugger, 823 F.2d 1495, 1496-97 (11th Cir. 1987) (citing the Piper case).
 "The waiver of jurisdiction theory is premised on the constitutional protection against arbitrary and capricious official action. See Camper v. Norris, 36 F.3d 782, 784 (8th Cir. 1994); Mobley, 823 F.2d at 1496. The theory is commonly traced to our decision in Shields. In Shields, we held the state's inaction for 28 years constituted a waiver of its jurisdiction over the prisoner. 370 F.2d at 1005-06. We further explained the state violated the prisoner's due process rights when it required him to serve his sentence after waiving its jurisdiction over him. Id. at 1006. In Piper, we clarified Shields, explaining when it is *Page 487 
that official misconduct rises to the level of a due process violation. See 485 F.2d at 246. We explained:
 "`[In order for a delay in the execution of a sentence to be repugnant to the Fourteenth Amendment,] it is not sufficient to prove official conduct that merely evidences a lack of eager pursuit or even arguable lack of interest. Rather the waiving state's action must be so affirmatively wrong or its inaction so grossly negligent that it would be unequivocally inconsistent with "fundamental principles of liberty and justice" to require a legal sentence to be served in the aftermath of such action or inaction.'[7]
 "Mobley, 823 F.2d at 1496-97 (alteration in original) (quoting Piper, 485 F.2d at 246).
 [7]"Most courts applying the Shields/Piper
standard have concluded its heavy burden was not satisfied on the facts of the particular case. See, e.g., Hawkins v. Freeman, 195 F.3d 732, 744 n. 7 (4th Cir. 1999) (listing several cases where the standard was not met); Camper, 36 F.3d at 784-85
(no due process violation where execution of sentence was delayed for four years); [United States v.] Martinez, 837 F.2d [861] 864-65 [(9th Cir. 1988)] (finding no due process violation when execution of prisoner's sentence was delayed for seven and one-half years); Mobley, 823 F.2d at 1496-97
(seven-year delay did not constitute due process violation); Piper, 485 F.2d at 246 (no due process violation)."
396 F.3d at 1148-49.
After concluding that the Government's conduct in Barfield
did not constitute a due-process violation under the facts presented, the Court noted, but declined to apply, the more stringent standard that was discussed in Hawkins:
 "The Government suggests we apply an even more stringent standard than the Shields/Piper test. The Government points to the Fourth Circuit's decision in Hawkins, holding the Shields/Piper test `fails to embody the full stringency of' the `shocks-the-conscience' standard mandated by the Supreme Court in substantive due process cases. 195 F.3d at 744. As the Supreme Court has explained, to establish a substantive due process violation in cases involving executive action, the plaintiff must prove the challenged conduct is so egregious that it `shocks the conscience.' County of Sacramento v. Lewis, 523 U.S. 833, 846-47, 118 S.Ct. 1708, 1716-17 n. 8, 140 L.Ed.2d 1043 (1998). However, we need not decide this issue because Barfield's due process claim fails even under the less stringent Shields/Piper standard."
396 F.3d at 1149 n. 8.
After carefully reviewing the record in the present case, we hold that Williams failed to establish that the Board acted outside its statutory authority. Williams did not prove that the Board's inaction was "so affirmatively wrong" or "so grossly negligent" that it would be unequivocally inconsistent with the fundamental principles of liberty and justice to require him to serve his full sentence. The evidence presented by Williams at the November 12, 2003, hearing indicated that the Board acted promptly in accordance with its statutory duty to declare Williams delinquent and to obtain the DOC's assistance in returning him to Alabama. By correspondence dated August 25, 1995, the OAPA requested that the Board issue a warrant for Williams's arrest and return to Alabama for a hearing on the alleged parole violation. On September 7, 1995, the Board authorized the issuance of the warrant *Page 488 
and directed the DOC to immediately issue the warrant. The Board declared Williams delinquent on September 11, 1995. The evidence provided no insight into the reason for the DOC's delay in issuing the warrant. The evidence did indicate that the Board did not follow up to ensure that the DOC had issued the warrant, as the DOC was required to do under § 15-22-31(a). Even assuming that the Board had a duty to go behind the DOC to ensure the issuance of the warrant, Williams did not introduce any evidence indicating that the Board's inaction in that respect, or the DOC's inaction for that matter, was anything more than an administrative mistake or oversight or, perhaps, indicative of "a lack of eager pursuit" or a "lack of interest" on the part of the Board and the DOC, none of which is a sufficient ground for finding a due-process violation.[10] As the cases referenced above indicate, the Shields/Piper standard was not intended as a trap for unwary state officials; it carries a heavy burden of proof. Williams did not satisfy that burden.[11]
 Post-Custody Delay
In Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593,33 L.Ed.2d 484 (1972), the United States Supreme Court held that a parolee is constitutionally entitled to certain due-process protections before parole may be revoked. One of those requirements is that a final revocation hearing must be held within a reasonable time after execution of the parole violator's warrant. See, e.g., D'Amato v. United States Parole Comm'n,837 F.2d 72 (2d Cir. 1988), discussing Moody v. Daggett,429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976).[12] *Page 489 
Where an unreasonable delay exists between the execution of a warrant charging a parolee with a parole violation and the holding of the revocation hearing, a principled analysis of the due-process issue posed by such a delay necessarily gravitates toward consideration of several factors, including the reason for the delay, the circumstances under which the parolee asserted the due-process claim, and the extent of any prejudice that may have resulted from the delay. For this reason, several federal circuit courts of appeal review due-process claims like the one raised by Williams by considering various factors and applying an analysis similar to the one used to address Sixth Amendment speedy-trial claims under Barker v. Wingo, supra. See, e.g., Hanahan v.Luther, 688 F.2d 844 (7th Cir. 1982); United States ex rel.Sims v. Sielaff, 563 F.2d 821 (7th Cir. 1977); Bryant v.Grinner, 563 F.2d 871 (7th Cir. 1977); Smith v. United States,577 F.2d 1025 (5th Cir. 1978); Gaddy v. Michael, 519 F.2d 669
(4th Cir. 1975); McNeal v. United States, 553 F.2d 66 (10th Cir. 1977); and Shelton v. United States Bd. of Parole,388 F.2d 567 (C.A.D.C. 1967).[13] See also 2 Neil P. Cohen,The Law of Probation and Parole § 26.6 (2d ed. 1999), and the cases cited therein. In that treatise, we find the following discussion:
 "In addition to statutory time limits, a constitutional standard is also applicable. In holding that due process requires a final revocation hearing, however, the Supreme Court in Morrissey v. Brewer[, 408 U.S. 471 (1972),] was unwilling to set a specific deadline for the hearing. Speaking only in general terms, the Court held: `The revocation hearing must be tendered within a reasonable time after the parolee is taken into custody. A lapse of two months . . . would not appear to be unreasonable.' [408 U.S. at 488.]
 "Since the hearing must be held within a reasonable time after the offender is taken into custody, the triggering event is custody rather than the conclusion of a preliminary hearing. Morrissey does not appear to establish time limits if the alleged violator is not taken into custody.
 "Moreover, in Moody v. Daggett, [429 U.S. 78
(1976),] the Supreme Court made it clear that the clock begins to run for due process purposes only when custody is the product of a violation warrant as opposed to a new offense. In Moody a federal parolee was convicted of other crimes and sentenced to prison for 10 years. The United States parole authorities lodged an unexecuted violator warrant as a detainer, which effectively stopped prison officials from releasing the offender until the parole authorities had an opportunity to execute the violator warrant. The Supreme Court held that, under the facts of the case, the mere lodging of the detainer did not deprive the already-incarcerated offender of any liberty interest protected by due process. Accordingly, Morrissey's requirement of a final hearing within a reasonable time does not apply until after the violator warrant has been executed and the offender has been taken into custody.
 "Statutory guidelines, of course, may mandate that a hearing be held before the date dictated by due process. *Page 490 
 "Although the reasonable time standard is by itself not particularly enlightening, the Morrissey Court did provide some guidance in its interpretation. By noting that a two-month delay would not generally be unreasonable, the Court acknowledged that some
delay is acceptable. Conversely, by selecting two months as its sole example of an acceptable delay, the Court may have been trying to say that the final hearing should not be put off for longer than a moderately short period.
 "As one might expect, courts have reached widely varying conclusions on when Morrissey requires the final hearing to be held.
 "Due process requires that a reasonable time be allowed for the alleged violator to prepare for the hearing. It is generally held, however, that the revocation need not be delayed until after other pending criminal charges are resolved.
 "Courts faced with a challenge to a delay in a final hearing must determine whether the delay was unreasonable. Drawing an analogy to speedy trial principles, they often consider some or all of the following factors: the length of and reason for the delay, the alleged violator's efforts to obtain a prompt hearing, and most importantly, the prejudice caused by the delay.
 "Almost invariably, where the parolee has been incarcerated the entire time or almost the entire time of the alleged unlawful delay, courts find that the parolee has suffered no prejudice as a result of the delay.
 "In assessing the reason for the delay, courts routinely hear, and often accept, claims that administrative backlogs are at least partially responsible for the tardy hearing. Administrative blunders, however, are viewed less favorably. On the other hand, if the offender is in another jurisdiction, many courts will not count delays resulting from the offender's absence from the state if the state made reasonable efforts to acquire jurisdiction.
 "The state's motive is examined to determine if the delay was the product of bad faith or an attempt to further the state's case or weaken the alleged violator's defense. A delay to permit intervening charges to be resolved is generally approved. A delay caused by an honest desire to help the violator is also viewed with favor. And a delay caused by judicial activity has not been attributed to improper state action.
 "Just as the reason for the delay is important, so are the alleged violator's efforts to obtain a timely hearing. Violators who cause a delay may not profit from it. A similar result is reached if the offender consented to the delay, although a determination should be made that the consent was knowing and intelligent. The failure to request a timely hearing also is viewed as a factor in favor of the state.
 "While the reason for the delay and the offender's efforts to avoid it are important, by far the most significant factor is the prejudice caused by the delay. A few courts have presumed prejudice from the length of the delay, but most hold that the existence or absence of prejudice must be determined on a case-by-case basis. The strongest example of prejudice is proof that specific evidence was lost as the result of the delay. Even then, if the violation is admitted or is based on a new criminal conviction, the loss of witnesses will generally not be considered prejudicial.
 "There is some authority for the view that the delay in holding a final revocation hearing can be longer if there has *Page 491 
been a preliminary revocation hearing. Apparently the preliminary hearing removes some of the prejudice potentially flowing from a tardy final hearing. In any event, a failure to prove prejudice will usually cause the court to dismiss the delay claim."
Id. (footnote omitted).
Consideration of the Barker factors in this due-process context, especially the requirement that prejudice be shown, is also discussed in 59 Am.Jur.2d Pardon and Parole § 146 (2002), in pertinent part, as follows:
 "The final revocation hearing must be held within a reasonable time after the parolee is taken into custody, even in those situations where the violation of parole is not disputed. The determination of the reasonableness of a delay between the time a parolee is taken into custody and the time of a revocation hearing must, to some degree, turn on the circumstance of each case, with some delays deemed reasonable. The Supreme Court, in Morrissey v. Brewer, [408 U.S. 471 (1972),] stated in dictum that a lapse of two months would not appear to be unreasonable.
 "Nevertheless, a parolee's claim that his or her due process rights have been violated by the delay preceding his or her parole revocation hearing cannot be judged using arbitrary guidelines. Rather, the standards for determining whether a defendant's constitutional right to a speedy trial has been denied must be applied. The four factors to be considered are the length of the delay, the reasons for the delay, the defendant's assertion of his or her right to a speedy trial, and the prejudice to the defendant as a result of the delay. However, although the fact that a parolee has a more limited due process right than does one accused of a crime does not mean that the parolee's right to a prompt hearing is to be judged more stingily than an accused's right to a speedy trial, it does cut against a rule that would achieve the converse result.
 "A parolee must bear the burden of demonstrating that a delay in a revocation hearing is unreasonable or that the parolee was prejudiced by the delay; the mere fact that a revocation hearing was delayed, without more, is insufficient to show an unreasonable delay. A parolee who seeks to claim prejudice on the basis of a delay in a parole revocation hearing must show what evidence and what witnesses would have presented at a timely hearing which were unavailable because of the delay and, absent such a showing, the parolee may not claim prejudice in that regard. . . ."
(Footnotes omitted.) See also 67A C.J.S. Pardon Parole §§ 79-82 (2002).
Federal and state courts that have considered the issue hold that the focal point of the inquiry is usually whether actual prejudice has occurred. Normally, delay, in and of itself, will not suffice to show prejudice, although it may, under certain circumstances, give rise to a rebuttable presumption of prejudice. See, e.g., Gaddy v. Michael, supra; Shelton v.United States Bd. of Parole, supra; Smith v. United States,
supra; and N. Cohen, supra, § 26.6 n. 12. The reason for this emphasis on prejudice is readily apparent — freeing a person who has been fairly determined to have violated his parole, even though that person has not been significantly prejudiced by a delayed revocation hearing, would be "very strong medicine" indeed for the Board. See, e.g., United States ex rel. Sims v.Sielaff, 563 F.2d at 828-29; and Smith v. United States,577 F.2d at 1028. This is especially so when a parolee cannot relitigate issues determined against him in other forums, as *Page 492 
in the situation, such as the one presented here, where the revocation is based on conviction of another crime. SeeMorrissey, 408 U.S. at 490, 92 S.Ct. 2593; Moody v. Daggett,429 U.S. at 79-80, 97 S.Ct. 274.
In addition, we note that this Court in James v. State,686 So.2d 1290 (Ala.Crim.App. 1996), cited with approval Cohen's treatise, including the discussion recognizing that courts draw an analogy to speedy-trial principles in cases involving the timeliness of revocation hearings in the context of probation and parole revocation.
Persuaded by the reasoning of the various courts referenced above and based on our decision in James, we hold that where an unreasonable delay is alleged to exist between the execution of a parole violator's warrant and the holding of the final revocation hearing, the four Barker factors used to address speedy-trial claims should be considered in determining whether a petitioner such as Williams has been denied due process and is entitled to be released from custody.
The record indicates that the total time that elapsed between Williams's return to Alabama in September 2000 and the parole hearing held on January 28, 2003, was approximately 28 to 29 months. A 28- to 29-month delay between the execution of a parole violator's warrant and a final revocation hearing is, in our view, unreasonable and presumptively prejudicial.[14]
However, such a long delay, although an important factor to be considered in determining whether there has been a deprivation of due process, is not determinative. The Board correctly points out that for approximately 9 to 11 months of that period Williams was in Washington, D.C., in connection with the federal charges that he was facing there. Likewise, the record indicates that the DOC's transfer of Williams from Kilby Correctional Facility to Staton Correctional Facility and the request by Williams's lawyer for a continuance of the August 14, 2002, parole hearing resulted in delays that were beyond the Board's control and that should not be counted against it. Therefore, we agree with the Board that the actual delay that can be reasonably attributed to the Board is 10 to 13 months. The Board could not explain the reason for even a 10- to 13-month delay; it did, however, concede that such a delay was too long, and it represented that such a long delay was not indicative of the Board's normal procedures. The Board also correctly points out that Williams waited over 2 years and 9 months after his return to Alabama to raise the due-process issue. Therefore, Williams bears at least some of the responsibility for the delay in that he failed to assert his rights promptly.
Finally, and, we think, most importantly, we must agree with the Board that Williams failed to prove that he suffered prejudice as a result of the delay. Williams had already been convicted in Ohio on the charge that formed the basis for the revocation, leaving only the issue of mitigation to be considered by the Board. Williams failed to show that the Board's 10- to 13-month delay in holding the parole hearing prevented any potential witness from testifying or prevented the introduction of any exculpatory or mitigating evidence at the parole hearing. See, e.g., James v. State, supra; Small v. Britton,500 F.2d 299 (10th Cir. 1974); Hackett v. State, 354 N.W.2d 247 (Iowa Ct.App. 1984). Although witnesses and evidence may play an important role in support of an argument *Page 493 
for mitigation, the loss of witnesses and evidence as a reason for finding prejudice would appear to have greater relevancy where the fact of a violation is in dispute. The loss of witnesses and evidence carries less significance where the fact of the violation is conclusively established by the criminal conviction itself. See, e.g., Gaddy v. Michael,519 F.2d at 677-78. In addition, Williams speculated, but in no way demonstrated, that holding the parole hearing any earlier would have changed the outcome of the hearing or the Board's decision to revoke his parole. In fact, as the Supreme Court pointed out in Moody v. Daggett, 429 U.S. at 89, 97 S.Ct. 274, although in a different context, some delay in holding a final revocation hearing may be more beneficial than prejudicial to an alleged parole violator where the only remaining inquiry is whether facts and circumstances exist to mitigate the Board's predilection to revoke parole:
 "Finally, there is a practical aspect to consider, for in cases such as this, in which the parolee admits or has been convicted of an offense plainly constituting a parole violation, the only remaining inquiry is whether continued release is justified notwithstanding the violation. This is uniquely a `prediction as to the ability of the individual to live in society without committing antisocial acts.' Morrissey, [408 U.S.] at 480, 92 S.Ct. at 2599
[(1972)]. In making this prophecy, a parolee's institutional record can be perhaps one of the most significant factors. Forcing decision immediately after imprisonment would not only deprive the parole authority of this vital information, but since the other most salient factor would be the parolee's recent convictions, here a double homicide, a decision to revoke parole would often be foreordained. Given the predictive nature of the hearing, it is appropriate that such hearing be held at the time at which prediction is both most relevant and most accurate at the expiration of the parolee's intervening sentence."
See also Fitzpatrick v. United States Parole Comm'n,444 F.Supp. 1302, 1305 (M.D.Pa. 1978).
Furthermore, to the extent Williams may have suffered anxiety from the uncertainty caused by the Board's delay in holding the parole hearing, that anxiety does not constitute serious prejudice under the facts presented here. Any anxiety he may have suffered probably was caused by the knowledge that he had been convicted of another offense in Ohio and that that conviction would weigh heavily on the Board's decision whether to revoke his parole. As the United States Court of Appeals for the Seventh Circuit noted in United States v. Scott, 850 F.2d 316, 321 (7th Cir. 1988), "anxiety and anguish are an `inevitable result of criminal prosecution' . . . and imprisonment."
Lastly, we note that Williams actually began serving the balance of his sentence on the date of his rearrest as a delinquent parolee, see § 15-22-32, Ala. Code 1975, even though there was a delay in the revocation process. We also note that even if his parole hearing had been held earlier and the Board had not revoked his parole, Williams would not have been released from custody. He would have been transferred to the custody of federal authorities either to stand trial on the federal charges in Washington, D.C., if the parole hearing had been held when Williams was initially returned to Alabama in September 2000, or to begin serving his sentences for the Washington, D.C., convictions, if the parole court had been held after Williams was returned to Alabama the second time in December 2001.
Taking all of these factors into consideration, we hold that Williams failed to demonstrate *Page 494 
that the Board's delay in holding the parole hearing rose to the level of a constitutional violation.
 Conclusion
After reviewing the record in this case, we share the circuit court's concern that Williams's final revocation hearing was not held until over seven years after he had been declared delinquent for committing another offense in Ohio. However, when the issues, as presented, are addressed in accordance with the standards applicable to pre-custody delay in issuing and executing a parole violator's warrant and post-custody delay in holding a final revocation hearing, we can find no constitutional violation. Therefore, in accordance with our standard for reviewing the Board's action, as set out in Ellard, supra, we hold that the circuit court erred in granting Williams's certiorari petition and reinstating his parole.
For the foregoing reasons, the circuit court's judgment reinstating Williams's parole is reversed and the case is remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur.
[1] Pursuant to § 12-3-9, Ala. Code 1975, this Court has appellate jurisdiction over postconviction writs in criminal cases. Certiorari petitions challenging the Board's revocation of parole are considered postconviction writs for purposes of §12-3-9. See Ex parte Alabama Board of Pardons Paroles,849 So.2d 255 (Ala.Crim.App. 2002). The Board filed a timely notice of appeal pursuant to § 6-6-641, Ala. Code 1975. See DearbornStove Co. v. Dean, 269 Ala. 561, 115 So.2d 258 (1959) (holding that § 1074, T.7, Code 1940, the predecessor to § 6-6-641, provides for appeals from final judgments of circuit courts in certiorari proceedings); and Ex parte Wright, 860 So.2d 1253
(Ala. 2002) (noting that in all cases in which an appeal is permitted by law as of right to the Alabama Supreme Court or to a court of appeals, the notice of appeal required by Rule 3, Ala.R.App.P., shall be filed with the clerk of the trial court within 42 days of the date of the entry of the judgment or order appealed from).
[2] An interstate compact is an agreement among participating states. Under this compact parolees, under certain circumstances, are allowed to transfer from one state to another for supervision. See § 15-22-1, Ala. Code 1975.
[3] Ohio records indicate that Williams is a recidivist offender with a long history of criminal activity.
[4] Section 15-22-31(a) provides:
 "(a) If the parole officer having charge of a paroled prisoner or any member of the Board of Pardons and Paroles shall have reasonable cause to believe that such prisoner has lapsed, or is probably about to lapse, into criminal ways or company or has violated the conditions of his parole in an important respect, such officer or board member shall report such fact to the Department of Corrections, which shall thereupon issue a warrant for the retaking of such prisoner and his return to the prison designated."
[5] Williams was apparently arrested on August 30, 1980, and charged with receiving stolen property in Ohio; that case was still pending when he was arrested in 1995 and charged with the drug offense. Williams received a six-month sentence for the receiving-stolen-property conviction; that sentence was to run concurrently with the six-month sentence he received in the drug case. The receiving-stolen-property charge was apparently unknown to Alabama authorities when Williams was paroled on March 13, 1995. The record indicates that because the receiving-stolen-property charge predated Williams's parole, his conviction on that charge was not used as a basis for revoking his parole.
[6] The Board states in its brief that "[i]t is . . . undisputed that the Ohio Adult Parole Authority closed its interest in supervising Williams pursuant to the Interstate Compact after the Alabama Board of Pardons and Paroles declared him delinquent and sought a warrant pursuant to statute." (Board's June 9, 2005, brief at p. 5.) However, the Board cites to no part of the record in support of this statement; likewise, we have found nothing in the record indicating that the OAPA "closed its interest" in supervising Williams. Williams testified at the hearing on his certiorari petition. He stated that he notified Alabama authorities that he had been released from custody in Ohio and inquired as to whether there was an outstanding warrant for his arrest. He stated that he was told that there was no outstanding warrant and he continued to report to the OAPA after his release. There appears to be nothing in the record to refute Williams's claim that he continued under the supervision of the OAPA for some period following his release in Ohio.
[7] Hearings on the petition had also been held on October 15, 2002, and February 12, 2003.
[8] We note that Williams did not argue at the hearing, and he does not argue on appeal, that the Board lost jurisdiction over him pursuant to Ohio's agreement under the interstate compact to supervise him. Furthermore, he did not argue at the hearing, and he does not argue on appeal, that the Board was barred under the doctrines of res judicata and collateral estoppel from proceeding with the revocation process. Based on our review of the transcript of the hearing and the briefs on appeal, we conclude that Williams has abandoned those arguments.
We also note Williams's argument that the post-custody delay in holding the parole hearing violated the speedy-disposition provisions of the Interstate Agreement on Detainer's ("the IAD"). However, the parole-violation charge in this case is not subject to the IAD. See Carchman v. Nash, 473 U.S. 716, 105 S.Ct. 3401,87 L.Ed.2d 516 (1985); see also Headrick v. State,816 So.2d 517 (Ala.Crim.App. 2001).
[9] As previously noted, nothing in the record refutes Williams's claims that he notified Alabama authorities that he had been released from custody in Ohio and that he continued under the supervision of the OAPA for some period following his release from custody in Ohio. Because there is no support for it in the record, we find unpersuasive the Board's argument that Williams absconded supervision following his release from custody in Ohio.
We also note the Board's argument that the circuit court erred in soliciting and considering information from outside the record made in connection with the revocation proceedings. Relying onSanders v. City of Dothan, 642 So.2d 437 (Ala. 1994), the Board states:
 "The trial court erred when it entertained matters outside the agency's record. In particular, the court ordered production of a list of delinquent parolees. This material was clearly inadmissible upon review of the decisions to revoke Williams's parole. . . ."
(Board's May 3, 2005, brief at p. 16.)
The Board cites Sanders for the proposition that, on certiorari review, the scope of the circuit court's inquiry into an agency's decision is restricted to the record made before the agency under review. Although the record indicates that the Board objected at the hearing to Williams's testimony and to various of the exhibits that were admitted into evidence, the Board has limited its argument on appeal to the admissibility of the list of delinquent parolees requested by the circuit court. Therefore, the Board has waived for purposes of this appeal the issue concerning the admissibility of any evidence introduced at the hearing other than the list of delinquent parolees. See Boshellv. Keith, 418 So.2d 89, 92 (Ala. 1982) ("When an appellant fails to argue an issue in its brief, that issue is waived."). With respect to the list of delinquent parolees, we can find no indication in the record that it played any role in the circuit court's decision to reinstate Williams's parole. Accordingly, we conclude that any error in the admission of that list into evidence at the hearing was harmless.
[10] We have found no specific statutory provision imposing an affirmative duty on the Board to follow up once it has authorized the DOC to issue a parole violator's warrant, and we decline to recognize such a duty in this case. We note that the authorization form used by the Board here stated: "You are further directed to notify this office of the return of the aforementioned paroled prisoner." This suggests that under current practice the Board relies on the DOC to notify it when a parolee has been located and returned.
[11] We note that the Board has not suggested that we apply the more stringent "shocks the conscience" standard discussed inHawkins. Like the Court in Barfield, we find it unnecessary to review this case under that standard because Williams's due-process claim fails even under the less stringent standard.
[12] The corresponding statutory requirement in Alabama is found in § 15-22-32(a), which provides:
 "Whenever there is reasonable cause to believe that a prisoner who has been paroled has violated his or her parole, the Board of Pardons and Paroles, at its next meeting, shall declare the prisoner to be delinquent, and time owed shall date from the delinquency. The warden of each prison shall promptly notify the board of the return of a paroled prisoner charged with violation of his or her parole. Thereupon, the board, a single member of the board, a parole revocation hearing officer, or a designated parole officer shall, as soon as practicable, hold a parole court at the prison or at another place as it may determine and consider the case of the parole violator, who shall be given an opportunity to appear personally or by counsel before the board or the parole court and produce witnesses and explain the charges made against him or her. The board member, parole revocation hearing officer, or a designated parole officer, acting as a parole court, shall, within a reasonable time, conduct the parole revocation hearing to determine guilt or innocence of the charges and may recommend to the board revocation or reinstatement of parole. Upon revocation of parole, the board may require the prisoner to serve out in prison the balance of the term for which he or she was originally sentenced, calculated from the date of delinquency or the part thereof as it may determine. The delinquent parolee shall be deemed to have begun serving the balance of the time required on the date of his or her rearrest as a delinquent parolee."
Because Williams's claim is based on the Due Process Clause of the Fourteenth Amendment and not on state-law grounds, and because § 15-22-32(a) otherwise sheds no light on what the Alabama legislature may think is a reasonable delay in holding a revocation hearing, we find it unnecessary to address this section.
[13] Shelton was decided before Barker; however, theShelton Court placed great emphasis on the length of the delay and prejudice resulting from the delay.
[14] The determination of reasonableness must, to some degree, turn on the circumstances of each case. See, e.g., Creech v.United States Bd. of Parole, 538 F.2d 205 (8th Cir. 1976);Thomas v. State Bd. of Parole, 220 N.W.2d 874 (Iowa 1974).